COUNTY OF CASS *vs.* DORILUS MORRISON.

September 13, 1881.

**Lands Granted to and earned by Northern Pacific Railroad Company subject to Taxation.**—The Northern Pacific Railroad Company was incorporated and endowed with a grant of lands by an act of Congress approved July 2, 1864. *Held*, that upon full compliance with the terms of the grant, so far as certain lands in this state are concerned, the company became entitled to a complete, perfect and absolute title to the same, and to receive the proper evidence to such title from the United States; that thereupon the lands ceased to belong to the United States, and become subject to the tax laws of this state, and that, the company having contracted to sell the same, they were properly taxable under such laws.

**Act of Congress Subsequent to Grant, imposing Condition, Unconstitutional.**—*Held further*, that the provision of the act of congress passed in 1870, requiring the company, as a condition precedent to its right to patents for such lands, to pay the cost of surveying, selecting and conveying the same, was an attempt to attach a new condition, not found in the original grant, to the company's right to the lands, and to the evidence of the title to the same, which congress had no power to impose, as its effect would be to deprive the company of property rights.

Appeal by defendant from a judgment for taxes of the district court for the counties of Cass, Crow Wing, Wadena, Aitkin and Itasca, *Stearns,* J., presiding.

*Morrison & Fitch,* for appellant, cited *Railway Company* v. *Prescott,* 16 Wall. 603, and *Railway Company* v. *McShane,* 22 Wall. 444.

*C. D. Kerr,* for respondent.

BERRY, J. This is a controversy as to the taxability of certain lands embraced within the limits of the grant made by the United States to the Northern Pacific Railroad Company, by an act of congress, approved July 2, 1864. The stipulated facts upon which the case was determined by the district court are as follows, so far as here important: At and long prior to the time of the assessment and levy of the taxes in question, the railroad of said company was constructed and in operation across this state, and especially through the counties in which the lands to which this controversy relates are

situated, and it has so continued to be operated to this time. The company has contracted to sell the lands to Morrison, who has paid for the same in full, and now contests the validity of the taxes. The government of the United States claims that, before issuing patents to the company for lands, it is entitled to receive the cost of surveying, selecting and conveying the same, from the company, and no patents for such lands have been issued, for the reason that the company has not paid such cost into the federal treasury.

It is agreed that, unless the failure to pay the cost mentioned prevents, the company is entitled to patents for the lands involved in the proceeding, and that they are subject to the taxes which have been levied upon them. The main question in the case is, do these lands belong to the United States? If they do, then they are exempted from taxation by that condition of the act of congress authorizing the people of the territory of Minnesota to form a state constitution and come into the Union, which requires that no tax shall be imposed on lands belonging to the United States. If, on the other hand, they do not belong to the United States, but the company, having become entitled to a complete, perfect and absolute title to them, and entitled to receive the proper evidence of such title from the United States, has contracted to sell them to Morrison, then, under the laws of this state, they are subject to taxation. As the land grant of the company within this state includes, if full, (as we understand it to be,) between two and three millions of acres, hundreds of thousands of which have already been sold, or contracted to be sold, by the company, as all will be in the future, the question presented is one of vast practical importance to the people of this state, and especially to the inhabitants of the counties, towns, and other territorial subdivisions in which the lands lie.

The Northern Pacific Railroad Company was incorporated and endowed with a grant of lands by an act of congress, approved July 2, 1864. 13 U. S. St. at Large, 365. Section 3, so far as necessary to be quoted, is as follows: "And be it further enacted that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line, * * * every alternate

section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state," etc. Section 4 provides "that whenever said Northern Pacific Railroad Company shall have twenty-five consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated, the president of the United States shall appoint three commissioners to examine the same; and if it shall appear that twenty-five consecutive miles of said road and telegraph line have been completed in a good, substantial and workmanlike manner, as in all other respects required by this act, the commissioners shall so report to the president of the United States, and patents of land, as aforesaid, shall be issued to said company, confirming to said company the right and title to said lands, situate opposite to and coterminous with said completed sections of said road; and from time to time, whenever twenty-five additional consecutive miles shall have been constructed, completed, and in readiness, as aforesaid, and verified by said commissioners to the president of the United States, then patents shall be issued to said company conveying the additional sections of land as aforesaid, and so on as fast as every twenty-five miles of said road is completed as aforesaid: provided, that not more than ten sections of land per mile, as said road shall be completed, shall be conveyed to said company for all that part of said railroad lying east of the western boundary of the state of Minnesota, until the whole of said railroad shall be finished and in good running order," etc. Section 20 is as follows: "And be it further enacted, that the better to accomplish the object of this act—namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes—congress may at any time, having due regard for the rights of said Northern Pacific Railroad Company, add to, alter, amend, or repeal this act." By an act of congress approved July 15, 1870, (16

U. S. St. at Large, 305,) among other things appropriating money for the survey of the public lands within the limits of the land grant of the Northern Pacific Railroad Company, it is provided "that before any land granted to said company by the United States shall be conveyed to any party entitled thereto, under any of the acts incorporating or relating to said company, there shall first be paid into the treasury of the United States the cost of surveying, selecting and conveying the same by the said company or party in interest."

From the concessions of the parties it appears that, except as respects the payment of the cost mentioned, everything has been done required by the terms of the grant to entitle the company to a complete, perfect and absolute title in fee to the lands in controversy, and to entitle it to receive the proper evidence of such title from the United States. In other words, the company has earned and paid for the lands by complying with the conditions of the grant, and if a formal conveyance be necessary to vest it with the legal title, it is, nevertheless, in the fullest sense, the equitable owner of the land, and the legal title is held by the United States as a naked trustee, solely and simply for the company's use and benefit. This is so irrespective of any notion of a grant *in præsenti* and its effect in conferring title *in præsenti.*

If, then, we leave out of view the provision before quoted as to the payment of the cost of surveying, etc., the case is one in which, under repeated decisions of the federal supreme court, the right and title of the company to the lands became such that they ceased to belong to the United States, and are therefore subject to taxation in accordance with the laws of this state. *Carroll* v. *Safford,* 3 How. 441; *Railway Company* v. *Prescott,* 16 Wall. 603; *Railway Company* v. *McShane,* 22 Wall. 444. Is this result affected by the provisions as to payment of cost of surveying, etc., in the act of July 15, 1870 ? We think not. These provisions seek to impose a new condition upon the grant of lands made by the act of 1864. They require the company to do something more than that act required it to do, to earn the lands, viz., to pay the cost of surveying, etc. To that extent the contract of the United States with the company is attempted to be impaired, and although the federal constitution contains no limita-

tions (in so many words) upon the power of congress to pass laws impairing the obligation of contracts, the fifth amendment contains a clause declaring that no person shall be deprived of property without due process of law. This covers the case of a contract right, whether the contract be executed or executory; for a contract right of either kind is property. *Rice* v. *Minn. & N. W. R. Co.*, 1 Black, 360; *Clark* v. *Mitchell*, 64 Mo. 564; *Twitchell* v. *Commonwealth*, 7 Wall. 321. We are therefore of opinion that it was not competent for congress to pass the provision requiring the company to pay the cost of surveying, etc., as a condition precedent to its right to patents for the lands granted to it by the act of 1864, and that that provision is, therefore, not binding upon the company, and does not affect its absolute, complete and perfect right to such lands, and to the proper evidence of such right, upon compliance with the terms in that act specified. The power of amendment, reserved in the twentieth section of the charter, obviously fails to embrace any authority to attach any such new condition to the grant.

This case is distinguishable from *Railway Company* v. *Prescott*, 16 Wall. 603, and *Railway Company* v. *McShane*, 22 Wall. 444. In both of these cases the enactment requiring payment of the expenses of surveying, locating and selecting the lands granted to the company, as a condition precedent to the issue of patents, was one section of an act so amending the original charter of the Union Pacific Railroad Company as largely to increase its original grant of lands. This act was one whole, and, in accepting and availing itself of the increase of its land grant, the company accepted the whole act, thereby assenting to the imposition of this new condition attached to its right to its original land grant. The condition was a part of the act by which the land grant was increased, and the increase was therefore controlled by it as a matter of course.

The district court decided that the lands in controversy were properly taxable, and properly taxed. Upon the grounds above indicated, we are of opinion that the decision was correct, and it is accordingly affirmed.